Filed 7/26/13  P. v. Manzo CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOSE LUIS MANZO,<br><br>        Defendant and Appellant. | A138047<br><br>(Napa County<br>Super. Ct. No. CR160956) |

Appellant, Jose Luis Manzo, appeals from the judgment and sentence following a plea of no contest.  His court-appointed attorney has filed a brief raising no legal issues and requesting this court to conduct an independent review of the record pursuant to *People v. Wende* (1979) 25 Cal.3d 436.  As the appeal is based solely on grounds occurring after entry of the plea and does not challenge the validity of the plea, it is authorized by rule 8.304(b)(4)(B) of the California Rules of Court.

**FACTS AND PROCEEDINGS BELOW**

The facts summarized in the March 27, 2012 report of the Napa County Sheriff's Department, which were never disputed, are as follows:

"[O]n March 6, 2012, deputies interviewed the 14-year-old confidential victim and her mother at the Courage Center in Napa.  The victim told deputies that when she was in fourth grade (approximately nine years old), one of her best friend's dad, later identified as the defendant, touched her.  The victim said her friend's parents were split up and she went over to the defendant's house on the weekends to spend the night with her friend, the defendant's daughter.

1

"The victim went on to say that a couple of the nights she was at the defendant's house, she woke up around 0400 hours and the defendant was touching her. She said she felt that the defendant thought she was sleeping when he was touching her, but she was not asleep. The victim said she was too scared to say anything to the defendant when he was touching her and she felt the fear carried over from when her little brother's dad would hit or yell at her and she was afraid the defendant would hit or yell at her if she said anything.

"The victim told deputies that her friend had a little sister and whenever they would fall asleep, they would fall asleep in the same bed because they would be watching a movie and the defendant would come into the room, get on the bed, fall asleep behind the victim, reach his arm over on the victim and touch her.

"The victim said the first time the defendant touched her was when she was laying in bed with her friend and the little sister and all three of them were facing the same way in the bed. The victim said the defendant came up behind her in the bed and 'grabbed her boob.' In response, the victim said she turned away. The victim said the defendant moved down and 'started touching me there' and said, 'He went on the front of my vagina and started rubbing.' The victim said she tried again to make him stop, but he did not stop and instead tried to kiss her.

"The victim said another time 'he (the defendant) actually tried to make out with me' and said the defendant tried to stick his tongue in her mouth. The victim explained that every time he touched her, she tried to turn away and when she turned away, to get the defendant to stop touching her, he would stop for a little bit, then start touching again. The victim said the defendant touched her under her bra and beneath her underwear with 'his hand' and he never touched her with any other parts of his body.

"Deputies asked the victim what was going through her mind at the time and the victim said she did not know, but 'probably mostly fear.' The victim said she was scared he (the defendant) would yell at her or get mad at her.

"The victim said, during the other times the defendant touched her 'the majority of it just happened the same way' and she said one time the defendant was wearing sweats

2

when he was touching her and he opened his sweats and pulled out his penis. The victim said the defendant did not touch her with his penis, but he did pull it out of his sweatpants while he was sitting behind her and she felt his penis on her back over her clothing. The victim said every time she tried to move away or pull away, it was not working, so she just gave up.

"The victim said every time the defendant touched her was during the course of a sleepover, and she knew the touching was wrong, but the only reason she did not quit going to her friend's house was because she did not want to lose her as a friend. The victim said she felt like she had to put up with the touching in order to keep the defendant's daughter as a friend.

"The victim told deputies the defendant touched her on four or five occasions and stopped around the time the defendant got married. After he got married, the victim said she still went to visit her friend at the defendant's house, but he did not touch her anymore. After elementary school, the victim said she and her friend ended up going to different schools and lost touch.

"When deputies asked the victim why she never told her mom earlier about being touched she said she felt like part of it was her fault and that she could have stopped it because she knew it was wrong, but she did not.

"On March 23, 2012, at approximately 1300 hours, deputies interviewed the defendant at the Napa Sheriff's Department. At that time, deputies asked the defendant how many times he touched the victim's breast and he said, 'It may have happened once, I don't recall exactly.' When deputies told him the victim said it happened on several occasions and the defendant replied, 'It could not be so.' When asked if he has desires or temptations toward that type of behavior, the defendant said, 'No.' The defendant said that he was in the bedroom with his daughters and the victim, but he never climbed into bed with the girls. He said they would watch cartoons together and when the girls fell asleep, he would turn the television off and leave the room.

"The defendant later admitted that he touched the victim's breast and said, 'I don't understand why it happened or how it could have happened.' He admitted that he

3

recognized this touching was inappropriate and denied being under the influence of drugs or alcohol. When deputies asked the defendant if he was curious about the victim's breast and if they were growing yet and he said, 'Yes, growing.'

"When deputies asked the defendant about his curiosity extended to the presence of pubic hairs near the victim's vagina, the defendant would not respond. Deputies asked the defendant that in this one isolated moment of weakness, was he sure he did not touch the victim's vaginal area and the defendant said, 'Possible, above the clothes.' He said when the victim moved, he would stop doing it. The defendant then said, 'Yes, I touched her, for curiosity.'

"When asked about the kissing on the mouth, while the victim was asleep, the defendant said, 'Possibly, I don't remember.' The defendant asked why if the victim remembers these things happened how come she had not said anything prior. Deputies explained that the victim was scared because he hurt her and that she trusted him like a father and when he touched her and kissed her he broke the trust."

Later, sheriff's deputies met with appellant's 18-year-old niece, identified in the report as "V-2," because his former wife told them the niece might also have been sexually abused by appellant. The interview is reported in the sheriff's report as follows:

"V-2 told deputies she was nine years old when the crime occurred and she was always going to the defendant's house to be with her cousins and have family parties and barbeques. V-2 said the first incident involving the defendant touching her occurred when all of the kids were playing hide and go seek. V-2 said it was her turn to count so the defendant asked all the kids to leave the garage and hide. The defendant then turned off all the lights in the garage and then she 'just felt somebody come and, like touch her inside her shirt and inside my pants.' V-2 said she just stood there until she heard her mom get back from the store and she told the defendant 'Stop.' V-2 said, 'He would, like, un-buttoned my pants, and just like stuck his hand and like, he didn't necessarily touch me, but I felt like he was about ready to until my mom and aunt got there.' V-2 said it happened every weekend where the defendant would find some way to 'just get me alone' and said, 'It happened every week on three different occasions.'

4

"V-2 said the second time was at the defendant's house and he touched her breast, under the bra and touched her vagina over her underwear and under her pants.

"The third time, V-2 said she was at the defendant's house for his daughter's birthday. She went inside the house to use the bathroom and when she went inside, she saw the defendant watching television in the bedroom. V-2 said she entered the bedroom to use the bathroom and the defendant shut the door and began to touch her. V-2 said she knew as soon as he shut the door he was going to touch her and touch her breast under her bra. V-2 said she believes the defendant did touch her vagina and described the area touched as 'the line of where your vagina starts, it's like, he was getting there.' V-2 said she had told her mom 'years after' and begged her mom not to say anything because of the defendant's two daughters."

At the time of these proceedings, appellant was 44 years old and had no prior convictions. When in his mid-twenties, he immigrated to California from Mexico and became a United States citizen. He is a high school graduate and was employed for 15 years as a maintenance man in an apartment complex. There is no showing he used illegal drugs or alcohol. He lived in Napa and has been married to his current wife for about five years. The events described in the Sheriff's report occurred approximately six years earlier, when appellant was in the midst of divorcing his previous wife.

### The Charged Offenses

On June 25, 2012, appellant was charged by information with two counts of continuous sexual abuse (Pen. Code, § 288.5, subd. (a)),[1] and 11 counts of child molestation (§ 288, subd.(a)).

### Appellant's Plea

On November 7, 2012, appellant pleaded no contest to one count of continuous sexual abuse and one count of child molestation, pursuant to a bargain for the dismissal

---

[1]    All statutory references are to the Penal Code except where otherwise indicated.

5

of the remaining counts with a *Harvey* waiver,[2] referral for a section 288.1 report, consideration of probation, and a maximum sentence of 14 years in state prison.

Appellant, who spoke to probation officers through an interpreter, admitted he touched the first victim's breast "one time" out of curiosity and to see whether they were growing. He said he was single at the time, going through " 'a lot of things and I simply was not well in my mind.' " He said, " 'I feel bad in a way. I didn't mean to hurt her.' " He said he is willing to comply with the terms and conditions of probation. Appellant denied ever touching V-2, stating, " 'I think she is confused because my father was the one who did this before.' " The probation department advised both victims of their right to make statements to the court, but neither responded.

### *The Recommendation of the Probation Department*

The probation department stated that appellant scored 11 on the LS/CMI evaluation, indicating a "medium risk to reoffend"; and scored zero on the Static 99R evaluation, "which places him in the Low Risk Category for being charged or convicted of another sexual offense if . . . released on probation." Nevertheless, the department stated that it "does not view him an appropriate candidate for a local disposition."

### *The Section 288.1 Report*

The court ordered preparation of a report pursuant to section 288.1 (which provides that any person convicted of certain sexual acts upon or with the body of a child under 14 years of age shall not have his or her sentence suspended until the court obtains the report of a reputable psychiatrist or psychologist as to the mental condition of that person). Dr. Madeline Andrew, M.D., prepared such a report in which she opined "with reasonable medical certainty, that [appellant] does not suffer from any mental defects or diseases," that his rehabilitation "is feasible," and he "is amenable to treatment." It was also Dr. Andrew's opinion "that [appellant's] risk of recidivism is extremely low."

---

[2]   *People v. Harvey* (1979) 25 Cal.3d 754.

6

*The Sentencing Hearing*

The court disagreed with Dr. Andrew's report, stating as follows: "Obviously the doctor's report is important but the court cannot ignore its own experience in the law both as an attorney and as a judge . . . . And, first of all, we're talking about an individual who's victimizing eight and nine year old girls. That's a different mindset than someone who's molesting a 13-year-old or 12-year-old. I think that shows very significantly a sexual interest in children . . . . [¶] We also have a situation where we have it not happening once but twice over a period of time. . . . He did it four or five years later and seems to me that that's ignored in Dr. Andrew's report. And for that reason I don't find that he's amenable [to probation] under [section] 1203.066(d)."

The court also observed that even if appellant were amenable to probation under that code section, it would deny probation "given the age of the victims and the period of time involved," as well as the fact that appellant "inflicted emotional injury on both of his victims."

On February 21, 2013, the court sentenced appellant to a total of 12 years in state prison: the 12-year midterm for continuous sexual abuse and concurrent six-year term for child molestation. Appellant received 388 days presentence credits, comprising 336 actual days plus 52 days good-time credit (§ 2933.1). The court imposed a restitution fine (§ 1202.4) in the amount of $5,000, that was stayed pending successful completion of parole (§ 1202.45). The court also imposed a $300 fine pursuant to section 290.3, an $80 court security fee (§ 1465.8), and a $60 criminal conviction assessment (Gov. Code § 70373). It ordered DNA testing (§ 296) and sex offender registration (§ 290).

On February 28, 2013, appellant filed a timely notice of appeal from the sentence imposed.

## DISCUSSION

Where, as here, an appellant has pled not guilty or no contest to an offense, the scope of reviewable issues is restricted to matters based on constitutional, jurisdictional, or other grounds going to the legality of the proceedings leading to the plea; guilt or innocence are not included. (*People v. DeVaughn* (1977) 18 Cal.3d 889, 895-896.)

7

Nothing in the record indicates appellant was mentally incompetent to stand trial or to understand the admonitions he received from the court prior to entering his plea, and to thereupon enter a knowing and voluntary plea.

The admonitions given appellant at the time he entered his plea fully conformed with the requirements of *Boykin v. Alabama* (1969) 395 U.S. 238 and *In re Tahl* (1969) 1 Cal.3d 122, and his waiver was knowing and voluntary.

There was a factual basis for the plea.

Appellant was at all times represented by competent counsel who protected his rights and interests.

The sentence imposed is authorized by law.

Our independent review having revealed no arguable issues that require further briefing, the judgment of conviction, which includes the sentence imposed, is affirmed.

_____
Kline, P.J.

We concur:


_____
Haerle, J.


_____
Lambden, J.

8